## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MATTHEW CARIELLO, TERENCE NICHOLAS**, and **CINDY CARTWRIGHT,** individually and on behalf of all others similarly situated, | Case No. 1:23-cv-05499-JPB |
| | Judge J.P. Boulee |
| Plaintiffs, | |
| | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. | |
| **NSC HOLDINGS, LLC and NSC TECHNOLOGIES**, LLC | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Matthew Cariello, Terence Nicholas, and Cindy Cartwright ("Plaintiffs") bring this consolidated Class Action Complaint ("Complaint") against Defendants NSC Holdings, LLC and NSC Technologies, LLC ("NSC Technologies" and together with NSC Holdings, LLC "Defendants") as individuals and on behalf of all others similarly situated, and alleges, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This class action arises out of the recent cyberattack and data breach ("Data Breach") resulting from NSC's failure to implement reasonable and industry

standard data security practices.

2.     Defendant NSC Technologies, LLC is a staffing company, with more than 30 offices nationwide, that provides "recruitment and placement services" for its clients "in the marine, light industrial, skilled trades, technical and professional industries."[1]

3.     Plaintiffs bring this Complaint against Defendants for their failure to properly secure and safeguard the sensitive information that it collected and maintained as part of its regular business practices, including, but not limited to names and Social Security numbers ("personally identifying information" or "PII").

4.     Upon information and belief, former and current employees at Defendant NSC Technologies' clients, as well as job applicants, are required to entrust Defendants with sensitive, non-public PII, without which Defendants could not perform their regular business activities, as a condition of becoming employed at Defendants' clients. Defendants retain this information for at least many years and even after the relationship has ended.

5.     By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiffs and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

---

[1] https://www.nsc-tech.com/

6.      According to the untitled letter that Defendant NSC Technologies sent to Plaintiffs and other impacted Class Members (the "Notice Letter"), on June 26, 2023, Defendants "became aware of potential suspicious activity within [its] computer systems."[2] In response, Defendants "began a comprehensive investigation to determine the full nature, scope, and impact of the activity."[3] As a result of its investigation, Defendants concluded—on an undisclosed date—that "NSC Technologies was the victim of a sophisticated cyberattack and an unauthorized actor likely acquired certain files stored on [its] systems between June 19, 2023, and June 20, 2023."[4]

7.      Defendants' investigation concluded that the PII compromised in the Data Breach included Plaintiffs and approximately 48,531 other individuals' information.[5]

8.      Defendants failed to adequately protect Plaintiffs' and Class Members' PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendants' negligent and/or careless acts and omissions and their utter failure to protect its clients' employees'

---

[2]  The "Notice Letter". A sample copy is available at https://apps.web.maine.gov/online/aeviewer/ME/40/e34fc0e2-8679-48f7-bb00-62a0c608a4b2.shtml

[3] *Id.*

[4] *Id.*

[5]  https://apps.web.maine.gov/online/aeviewer/ME/40/e34fc0e2-8679-48f7-bb00-62a0c608a4b2.shtml

sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9.      In breaching their duties to properly safeguard its clients' employees' PII and give them timely, adequate notice of the Data Breach's occurrence, Defendants' conduct amounts to negligence and/or recklessness and violates federal and state statutes.

10.      Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts at least to negligence and violates federal and state statutes.

11.      Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate

protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

12.     Plaintiffs and Class Members have suffered injuries as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails after the Data Breach; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

13.     Plaintiffs and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data

Breach and who remain at risk due to Defendants' inadequate data security practices.

## **PARTIES**

14.    Plaintiff Terence Nicholas is and has been, at all relevant times, a resident and citizen of Boston Massachusetts. Mr. Nicholas received the Notice Letter, via U.S. mail, directly from Defendant NSC Technologies, dated November 21, 2023. Mr. Nicholas provided his PII to Defendant NSC Technologies on the condition that it be maintained as confidential and with the understanding that Defendants would employ reasonable safeguards to protect his PII. If Mr. Nicholas had known that Defendants would not adequately protect his PII, he would not have entrusted Defendants with his PII or allowed Defendant to maintain this sensitive PII.

15.    Plaintiff Cindy Cartwright is an individual citizen of the State of Virginia.

16.    Plaintiff Matthew Cariello, is, and at all times mentioned herein was, an individual citizen of Texas and a former employee of Defendant NSC Technologies.

17.    Defendant NSC Holdings, LLC is a Delaware limited liability company with its principal place of business located at 950 East Paces Ferry Rd, NE, Suite 1650, Atlanta, Georgia.

18.     Defendant NSC Technologies, LLC is a Virginia limited liability company with its principal place of business located at 950 East Paces Ferry Rd, NE, Suite 1650, Atlanta, Georgia.

19.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, including the named members of both the Defendant LLCs who are only known to Defendants and who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs. Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known, including the members of the LLC.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiffs, is a citizen of a state different from Defendants.

21.     This Court has personal jurisdiction over Defendants because their principal places of business are in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

22.    Venue is proper under 18 U.S.C § 1391(b)(1) because Defendants' principal places of business are in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

### *Defendants' Business*

23.    Defendant NSC Technologies, LLC is a staffing company, with more than 30 offices nationwide, that provides "recruitment and placement services" for its clients "in the marine, light industrial, skilled trades, technical and professional industries."[6]

24.    NSC Holdings, LLC and NSC Technologies, LLC share a principal place of business and, upon information and belief, are related business entities with common ownership.

25.    Plaintiffs and Class Members are current and former employees of Defendant's clients.

26.    In order to apply to be an employee at Defendants' clients, Plaintiffs and Class Members were required to provide sensitive and confidential PII, including their names and Social Security numbers.

27.    The information held by Defendant NSC Technologies in its computer systems included the unencrypted PII of Plaintiffs and Class Members.

---

[6] https://www.nsc-tech.com/

28.     Upon information and belief, in the course of collecting PII from its clients' employees, including Plaintiffs, Defendants promised to provide confidentiality and adequate security for employee data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

29.     Indeed, Defendant NSC Technologies' Privacy Policy provides that: "[w]e are committed to respecting your privacy and protecting your personal information."[7]

30.     Plaintiffs and Class Members provided their PII to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with its obligations to keep such information confidential and secure from unauthorized access.

31.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and Class Members relied on the sophistication of Defendants to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

---

[7] https://www.nsc-tech.com/privacy-policy/

32.    Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendants have a legal duty to keep its clients' employees' PII safe and confidential.

33.    Defendants had obligations created by FTC Act, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

34.    Defendants derived a substantial economic benefit from collecting Plaintiffs' and Class Members' PII. Without the required submission of PII, Defendant NSC Technologies could not perform the staffing services it provides.

35.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

### The Data Breach

36.    On or about November 21, 2023, Defendant NSC Technologies sent Plaintiffs and other victims of the Data Breach an untitled letter (the "Notice Letter"), informing them that:

> **What Happened?** On June 26, 2023, we became aware of potential suspicious activity within our computer systems. Upon learning of the activity, we quickly took steps to confirm the security our systems and with the assistance of external cybersecurity specialists, began a comprehensive investigation to determine the full nature, scope, and impact of the activity.

We also promptly notified federal law enforcement. The investigation determined that NSC Technologies was the victim of a sophisticated cyberattack and an unauthorized actor likely acquired certain files stored on our systems between June 19, 2023, and June 20, 2023. We subsequently conducted a thorough and time-consuming review of the files likely affected, to determine whether they contained any sensitive information and to whom the information relates. This review recently concluded on November 1, 2023, and we determined that your information was in the files that may have been acquired without authorization.

**What Information Was Involved?** We have no evidence of any actual or attempted misuse of your personal information. The information present in the files that were potentially impacted by this event included your name and Social Security number.[8]

37.    Omitted from the Notice Letter were any explanation as to why it took Defendants nearly *four months* after detecting the Data Breach occurrence to inform Plaintiffs and Class Members of the cyber-attack, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their PII remains protected.

38.    This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

---

[8] Notice Letter.

39.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

40.    The attacker accessed and acquired files in Defendants' computer systems containing unencrypted PII of Plaintiffs and Class Members, including their Social Security numbers and other sensitive information. Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

41.    Plaintiffs further believe that their PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**Data Breaches Are Preventable**

42.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[9]

43.    To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

_____

[9] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[10]

44.    To prevent and detect cyber-attacks or ransomware attacks NSC Technologies could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

---

[10] *Id.* at 3-4.

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[11]

45.     Given that Defendant Technologies was storing the sensitive PII of its clients' current and former employees, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

46.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of more than forty-eight thousand current and former employees, including that of Plaintiffs and Class Members.

---

[11] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

***Defendants Acquire, Collect, And Store Plaintiffs' and the Class's PII***

47.    As a condition of becoming an employee at Defendant NSC Technologies' clients, Plaintiffs and Class Members were required to give their sensitive and confidential PII to Defendants.

48.    Defendants retain and store this information and derives a substantial economic benefit from the PII that they collect. But for the collection of Plaintiffs' and Class Members' PII, Defendant NSC Technologies would be unable to perform its business services.

49.    By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

50.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendants to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

51.    Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiffs and Class Members.

16

52.     Upon information and belief, Defendants made promises to Plaintiffs and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

53.     Indeed, Defendant NSC Technologies' Privacy Policy provides that: "[w]e are committed to respecting your privacy and protecting your personal information."[12]

### Defendants Knew, Or Should Have Known, of the Risk Because Staffing Companies In Possession Of PII Are Susceptible To Cyber Attacks

54.     Data thieves regularly target companies like Defendants due to the highly sensitive information that they custody. Defendants knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

55.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting staffing companies that collect and store PII and other sensitive information, like Defendants, preceding the date of the breach.

56.     In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[13]

---

[12] https://www.nsc-tech.com/privacy-policy/
[13] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/

57.    In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

58.    Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[14]

59.    Additionally, as companies became more dependent on computer systems to run their business,[15] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is

---

[14]https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection
[15]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[16]

60.    As a custodian of PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiffs and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

61.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

62.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

63.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to more than

---

[16]    https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

forty thousand individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

64.     In the Notice Letter, Defendant NSC makes an offer of 24 months of identity monitoring services. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs and Class Members' PII. Moreover, once this service expires, Plaintiffs and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

65.     Defendant NSC Technologies' offering of credit and identity monitoring demonstrates that Plaintiffs' and Class Members' sensitive PII *was* in fact affected, accessed, compromised, and exfiltrated from Defendants' computer systems.

66.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

67.     The ramifications of Defendants' failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen—

particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

68.    As a staffing company in possession of its clients' current and former employees' PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

### *Value of Personally Identifying Information*

69.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

---

[17] 17 C.F.R. § 248.201 (2013).
[18] *Id.*

70.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[19] For example, Personal Information can be sold at a price ranging from $40 to $200.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

71.    For example, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

---

[19] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ .

[21] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

illegally using your Social Security number and assuming your identity can cause a lot of problems.[22]

72.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

73.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[23]

74.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit

---

[22] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[23] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change— *i.e.,* Social Security numbers and names. Because the information compromised in the Data Breach is immutable, Plaintiffs and Class Members are at risk of identity theft and fraud for the remainder of their lives.

75.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

76.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

77.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[24] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

78.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

### Defendants Fail To Comply With FTC Guidelines

79.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

80.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand

---

[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

their network's vulnerabilities; and implement policies to correct any security problems.[26]

81.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[27]

82.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

83.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect employee data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential employee data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from

---

[26] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf
[27] *Id.*

these actions further clarify the measures businesses must take to meet their data security obligations.

84.    These FTC enforcement actions include actions against staffing companies, like Defendant.

85.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

86.    Defendants failed to properly implement basic data security practices.

87.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to its clients' employees' PII or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

88.    Upon information and belief, NSC was at all times fully aware of its obligation to protect the PII of its clients' employees, NSC was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

***Defendants Fail To Comply With Industry Standards***

89.    As noted above, experts studying cyber security routinely identify entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

90.    Several best practices have been identified that, at a minimum, should be implemented by staffing companies in possession of PII, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. NSC failed to follow these industry best practices, including a failure to implement multi-factor authentication.

91.    Other best cybersecurity practices that are standard for staffing companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. NSC failed to follow these cybersecurity best practices, including failure to train staff.

92.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including

without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

93.    These foregoing frameworks are existing and applicable industry standards for staffing companies' caretaking of employees' PII and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### Common Injuries & Damages

94.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory

damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

### *Data Breaches Increase Victims' Risk Of Identity Theft*

95.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

96.     Plaintiffs' and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

97.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[28]

---

[28] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials.

98.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

99.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014),             https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-
insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

100.   The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiffs and the other Class Members.

101.   Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

102.   Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### *Loss Of Time To Mitigate Risk Of Identity Theft & Fraud*

103.   As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

104.   Thus, due to the actual and imminent risk of identity theft, Defendant NSC Technologies in its Notice Letter instructs Plaintiffs and Class Members to take the following measures:

> [W]e encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity. You can also find out more about how to safeguard your information in the enclosed Steps You Can Take to Protect Personal Information. There, you will find additional information about the complimentary credit monitoring services and how to enroll.[29]

105.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the Data Breach upon receiving the Notice Letter.

106.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[30]

107.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting

---

[29] Notice Letter.

[30] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

108.  And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

### *Diminution of Value of PII*

109.  PII is a valuable property right.[32] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

110.  Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[33]

---

[31]    *See*    Federal    Trade    Commission,    *Identity    Theft.gov*, https://www.identitytheft.gov/Steps

[32] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007,  https://www.gao.gov/new.items/d07737.pdf (GAO Report").

[33] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

111.   An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[34]

112.   In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[35,36]

113.   Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[37]

114.   As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

115.   At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members,

---

[34] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/
[35] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[36] https://datacoup.com/
[37] https://digi.me/what-is-digime/

and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

116.  The fraudulent activity resulting from the Data Breach may not come to light for years.

117.  Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

118.  Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' networks, amounting to more than forty thousand individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

119.  The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

120.   Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

121.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

122.   Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

123.   The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

*Loss Of Benefit Of The Bargain*

124.   Furthermore, Defendants' poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When submitting PII to Defendants and/or its clients under certain terms through a job application and/or onboarding paperwork, Plaintiffs and other reasonable employees understood and expected that Defendants would properly safeguard and protect their PII, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class Members received an employment position of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants and/or its clients.

*Plaintiff Nicholas's Experience*

125.   Upon information and belief, in the past, Plaintiff Terence Nicholas submitted a job application to at least one of Defendant NSC Technologies' clients and used Defendant's services to do so.

126.   As a condition of submitting a job application to Defendant NSC Technologies' client and/or to use Defendant NSC Technologies' services, he was required to supply Defendants with his PII, including, but not limited to: his name and Social Security number.

127.   At the time of the Data Breach—June 19, 2023 through June 20, 2023—Defendants retained Plaintiff Nicholas's PII in their systems.

128.   Plaintiff Nicholas is very careful about sharing his sensitive PII. Mr. Nicholas stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

129.   Plaintiff Nicholas received the Notice Letter, by U.S. mail, directly from Defendant NSC Technologies, dated November 21, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including his name and Social Security number.

130.   As a result of the Data Breach, and at the direction of Defendant NSC Technologies' Notice Letter, Plaintiff Nicholas made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter. Plaintiff Nicholas has spent significant time thus far dealing with the Data Breach—valuable time Plaintiff Nicholas otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

131.  Plaintiff Nicholas suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of

the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

132.   Plaintiff also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails reasonably close in time after the Data Breach, which, upon information and belief, was caused by the Data Breach.

133.   The Data Breach has caused Plaintiff Nicholas to suffer fear, anxiety, and stress, which has been compounded by the fact that NSC has still not fully informed him of key details about the Data Breach's occurrence.

134.   As a result of the Data Breach, Plaintiff Nicholas anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Nicholas is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

135.  Plaintiff Nicholas has a continuing interest in ensuring that his PII, which, upon information and belief, remain backed up in Defendants' possession, is protected and safeguarded from future breaches.

**_Plaintiff Cindy Cartwright's Experience_**

136.  Plaintiff Cartwright is a former employee of NSC Technologies. She began her employment in or around August 2021 and was an employee of NSC Technologies through July 2023. As a condition of employment with Defendant Technologies, Plaintiff Cartwright was required to give her Private Information to Defendant NSC Technologies.

137.  Plaintiff Cartwright is very careful about sharing her Private Information. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Cartwright stores any documents containing her sensitive PII in a safe and secure location or destroys the documents.

138.  Plaintiff Cartwright only allowed Defendants to maintain, store, and use her Private Information because she believed that Defendants would use basic, industry standard data security measures, such as those set forth herein, to protect it from unauthorized access.

139.  Plaintiff Cartwright received the Notice of Data Breach on or around November 21, 2023, stating, in relevant part, that her name and Social Security number were disclosed in the Data Breach.

140.   Plaintiff Cartwright is now at an imminent, immediate, and continuing increased risk of experiencing devastating instances of identity theft, including but not limited to, having loans opened in her name, tax returns filed in her name, utility bills opened in her names, credit card accounts opened in her name, unauthorized charges made on her financial accounts, and other forms of identity theft.

141.   Plaintiff Cartwright also faces a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to continue to carry out such targeted schemes against Plaintiff.

142.   Further, as a direct and proximate result of Defendants' conduct, Plaintiff Cartwright has been forced to spend time dealing with the effects of the Data Breach. Specifically, Plaintiff Cartwright also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on her everyday life.

143.   Plaintiff Cartwright may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

144.   Plaintiff Cartwright suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Plaintiff's Private Information, which has an inherent market value in both legitimate and illegal markets, has been

harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff for her property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and because that data no longer necessarily correlates only with activities undertaken by Plaintiff, thereby causing additional loss of value.

145.   Plaintiff Cartwright has suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

146.   Moreover, Plaintiff Cartwright has an interest in ensuring that her Private Information, which is believed to still be in the possession of Defendants, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

147.   As a direct and proximate result of NSC's actions and inactions, Plaintiff Cartwright has suffered a loss of privacy and has suffered cognizable harm,

including an imminent and substantial future risk of harm, in the forms set forth above.

### *Plaintiff Cariello's Experience*

148.   Plaintiff Matthew Cariello is a former employee of one of NSC Technologies' subsidiaries, Anistar Technologies.

149.   As a condition of receiving employment with NSC Technologies, he was required to provide his PII, directly or indirectly, to Defendant NSC Technologies, including his name, bank account number and routing number.

150.   At the time of the Data Breach—approximately June 19, 2023, through June 20, 2023—Defendants retained Plaintiff's PII in their systems.

151.   Plaintiff is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he known of Defendants' lax data security policies.

152.   Plaintiff Matthew Cariello received the Notice Letter, by U.S. mail, from Defendant NSC Technologies, dated November 21, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including his name and social security number.

153.   As a result of the Data Breach, and at the direction of Defendant NSC

Technologies' Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

154.   Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

155.   The Data Breach has caused Plaintiff Cariello to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

156.   As a result of the Data Breach, Plaintiff Cariello anticipates spending considerable time and money on an ongoing basis to try to mitigate and address

harms caused by the Data Breach.

157.   As a result of the Data Breach, Plaintiff Cariello is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

158.   Plaintiff Cariello has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## **CLASS ALLEGATIONS**

159.   Plaintiffs bring this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

160.   The Class that Plaintiffs seek to represent is defined as follows:

All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant NSC Technologies in November 2023 (the "Class").

161.   Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol

for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

162.   Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

163.   <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. According to the breach report submitted to the Office of the Maine Attorney General, at least 48,531 persons were impacted in the Data Breach.[38] The Class is apparently identifiable within Defendants' records, and Defendant NSC Technologies has already identified these individuals (as evidenced by sending them breach notification letters).

164.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

     a.   Whether and to what extent Defendants had a duty to protect the PII of Plaintiffs and Class Members;

---

[38]   https://apps.web.maine.gov/online/aeviewer/ME/40/e34fc0e2-8679-48f7-bb00-62a0c608a4b2.shtml

b. Whether Defendants had respective duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendants had respective duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the PII of Plaintiffs and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct;

k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

165.  Typicality: Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

166.  Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

167.  Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members.

Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

168.    <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

169.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be

recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

170.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

171.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

172.    Unless a Class-wide injunction is issued, Defendants may continue in its failure to properly secure the PII of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

173.    Further, Defendants has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

174.    Likewise, particular issues under Rule 23(b)(2) are appropriate for certification because such claims present only particular, common issues, the

resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendants failed to timely notify the Plaintiffs and the class of the Data Breach;

    b.  Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    c.  Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d.  Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

    e.  Whether Defendants failed to take commercially reasonable steps to safeguard employee PII; and

    f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

**CAUSES OF ACTION**

**<u>COUNT I</u>**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

175. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 174 above as if fully set forth herein.

176. Defendant NSC Technologies requires its clients' prospective employees, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing its services.

177. Defendants gathered and stored the PII of Plaintiffs and Class Members as part of its business of soliciting its services to its clients, which solicitations and services affect commerce.

178. Plaintiffs and Class Members entrusted Defendants with their PII with the understanding that Defendants would safeguard their information.

179. Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

180. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

181. Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and

enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

182.   Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

183.   Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential PII, a necessary part of using Defendants' services to submit a job application to Defendants' clients.

184.   Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants is bound by industry standards to protect confidential PII.

185.   Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiffs or the Class.

186.   Defendants also had a duty to exercise appropriate clearinghouse practices to remove former employees' PII it was no longer required to retain pursuant to regulations.

187.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

188.    Defendants had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

189.    Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.  Failing to adequately monitor the security of their networks and systems;

    c.  Allowing unauthorized access to Class Members' PII;

    d.  Failing to detect in a timely manner that Class Members' PII had been compromised;

e.  Failing to remove former employees' PII it was no longer required to retain pursuant to regulations,

f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.  Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

190.  Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

191.  Defendants' violation of Section 5 of the FTC Act constitutes negligence.

192.  Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

193.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

194.   A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

195.   It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the staffing industry.

196.   Defendants has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed.

197.   Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems.

198.   It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

199.   Plaintiffs and the Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

200.   Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

201.   Defendants' duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

202.   Defendants has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

203.   But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

204.   There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

205.   As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

206.   As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or

harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

207.   Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

208.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

209.   Defendants' negligent conduct is ongoing, in that it still holds the PII of Plaintiffs and Class Members in an unsafe and insecure manner.

210.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

211.   Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 174 above as if fully set forth herein.

212.   Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

213.   As a staffing company in possession of the sensitive PII of its clients' employees, Defendants owed a duty of care in protecting Plaintiffs' and Class Members' PII, pursuant to Section 5 of the FTC Act, similar state statutes, and an independent duty of care.

214. In its Privacy Policy, Defendant NSC Technologies promises prospective employees that it will not disclose their PII, outside of the excepted circumstances set forth therein—none of which apply here. However, Plaintiffs' and Class Members' PII has been disclosed without their written authorization as a result of the Data Breach.

215.   As evidenced by the occurrence of the Data Breach, Defendants negligently misrepresented its data security measures and Privacy Policy to Plaintiffs and Class Members.

216.   Defendants violated Section 5 of the FTC Act and similar state statutes by failing to use reasonable measures to protect PII and not complying with industry standards. Defendants' conduct was particularly unreasonable given the nature and

amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

217.    Defendants violated Section 5 of the FTC Act by negligently misrepresenting its data security practices to Plaintiffs and Class Members.

218.    Defendants violated Section 5 of the FTC Act by breaching its duties of care to Plaintiffs and Class Members, as provided in its Privacy Policy.

219.    Defendants' violation of Section 5 of the FTC Act and other duties (listed above) constitutes negligence *per se.*

220.    Class members are consumers within the class of persons Section 5 of the FTC Act and similar state statutes were intended to protect.

221.    Moreover, the harm that has occurred is the type of harm the FTC Act and similar state statutes were intended to guard against.

222.    Indeed, the FTC has pursued over fifty enforcement actions against financial institutions which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

223.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

224.   There is a close causal connection between Defendants' failure to implement or ensure security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

225.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

226.   The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' PII from a foreseeable and preventable cyber-attack.

227.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

228.   As a direct and proximate result of Defendants' negligence *per se*, the products and/or services that Defendants provided to Plaintiffs and Class Members damaged other property, including the value of their PII.

229.   Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

230.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

231.   Defendants' negligent conduct is ongoing, in that it still holds the PII of Plaintiffs and Class Members in an unsafe and insecure manner.

232.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

233.   Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 174 above as if fully set forth herein.

234.   Plaintiffs and Class Members were required to provide their PII to Defendants as a condition of their employment with Defendants' clients and/or to submit a job application to Defendants' clients.

235.   Plaintiffs and Class Members provided their labor to Defendants' clients and their PII to Defendants in exchange for (among other things) Defendants' promise to protect their PII from unauthorized disclosure.

236.   On information and belief, at all relevant times Defendants promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

237.    On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

238.    Implicit in the agreement between Plaintiffs and Class Members and the Defendants to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

239.    When Plaintiffs and Class Members provided their PII to Defendants as a condition of their employment at Defendants' clients and/or to submit a job application to Defendants' clients, they entered into implied contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

240.    Defendants required Class Members to provide their PII as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their PII to Defendants.

241.   In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

242.   Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure. Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

243.   Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

244.   Defendants breached its implied contracts with Class Members by failing to safeguard and protect their PII.

245.   As a direct and proximate result of Defendants' breaches of the implied contracts, Class Members sustained damages as alleged herein.

246.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

247.   Plaintiffs and Class Members are also entitled to nominal damages for the breach of implied contract.

248.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### COUNT IV
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiffs and the Class)

249.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 174 above as if fully set forth herein.

250.    Every contract in this State has an implied covenant of good faith and fair dealing. This implied covenant is an independent duty and may be breaches when there is no breach of a contract's actual and/or express terms.

251.    Plaintiffs and Class Members have complied with and performed all conditions of their contracts with Defendants.

252.    Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard employee PII, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of PII and storage of other personal information after Defendants knew or should have known of the security vulnerabilities of the systems that were exploited in the Data Breach.

253.    Defendants acted in bad faith and/or with malicious motive in denying Plaintiffs and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

254.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 174 above as if fully set forth herein.

255.    Plaintiffs and Class Members conferred a monetary benefit to Defendants in the form of the provision of their PII and Defendants would be unable to engage in its regular course of business without that PII.

256.    Defendants knew that Plaintiffs and Class Members conferred a monetary benefit to Defendants and it accepted and retained that benefit. Defendants profited from this monetary benefit, as the transmission of PII to Defendants from Plaintiffs and Class Members is an integral part of Defendant's business. Without collecting and maintaining Plaintiffs' and Class Members' PII, Defendants would be unable to perform its services.

257.    Defendants were supposed to use some of the monetary benefit provided to it by Plaintiffs and Class Members to secure the PII belonging to Plaintiffs and Class Members by paying for costs of adequate data management and security.

258. Defendants should not be permitted to retain any monetary benefit belonging to Plaintiffs and Class Members because Defendants failed to implement necessary security measures to protect the PII of Plaintiffs and Class Members.

259. Defendants gained access to the Plaintiffs' and Class Members' PII through inequitable means because Defendants failed to disclose that it used inadequate security measures.

260. Plaintiffs and Class Members were unaware of the inadequate security measures and would not have entrusted their PII to Defendants had they known of the inadequate security measures.

261. To the extent that this cause of action is pleaded in the alternative to the others, Plaintiffs and Class Members have no adequate remedy at law.

262. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for

70

unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

263.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

264.   Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds from the monetary benefit that it unjustly received from them.

**COUNT VI**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

265.   Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 174 above as if fully set forth herein.

266.   Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and common law described in this Complaint.

267.    Defendants owe a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' PII.

268.    Defendants still possess PII of Plaintiffs and Class Members.

269.    Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and the risk remains that further compromises of his PII will occur in the future.

270.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owe a legal duty to secure Plaintiffs' and Class Members' PII from unauthorized disclosure and theft;

b.    Defendants' existing security measures do not comply with its implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect Plaintiffs' and Class Members' PII; and

c.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs' and Class Members' PII.

271.    This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal

and industry standards to protect Plaintiffs' and Class Members' PII, including the following:

272.    Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members; and

273.    Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

  a. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

  b. engaging third-party security auditors and internal personnel to run automated security monitoring;

  c. auditing, testing, and training its security personnel regarding any new or modified procedures;

  d. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

  e. conducting regular database scanning and security checks;

    f.   routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

    g.   routinely and continually purging all former PII that is no longer necessary in order to adequately conduct its business operations; and

    h.   meaningfully educating its users about the threats they face with regard to the security of their PII.

274.   If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

275.   The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

276.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a

subsequent data breach at Defendants, thus preventing future injury to Plaintiffs and other Class Members whose PII would be further compromised.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendants and that the Court grants the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the   confidentiality and integrity of the PII of Plaintiffs and Class Members;

v.    prohibiting Defendants from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vi.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendants to segment data by, among other things creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.    requiring Defendants to conduct regular database scanning and securing checks;

xi.    requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.    requiring Defendants to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    requiring Defendants to implement a system of tests to assess its

employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii.   for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an

annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual (and/or restitution), statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, expert fees, litigation expenses, and costs of prosecuting this action pursuant to O.C.G.A Section 13-6-11 and as otherwise allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: July 11, 2024                Respectfully Submitted,

By: */s/  David K. Lietz*
David K. Lietz*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
5335 Wisconsin Avenue NW, Suite 440
Washington, D.C. 20015-2052
Tel: (866) 252-0878 / Fax: (202) 686-2877
dlietz@milberg.com

*Interim Lead Counsel*

79

Mason Barney (*pro hac vice* to be filed)
Tyler Bean (*pro hac vice* to be filed)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: tbean@sirillp.com

**SHAMIS & GENTILE P.A.**
Andrew J. Shamis, Esq.
Georgia Bar No. 49496
ashamis@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (*pro hac vice* to be filed)
Florida Bar No. 0100537
scott@edelsberglaw.com
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: (786) 289-9471
Direct: (305) 975-3320

MaryBeth V. Gibson
Georgia Bar No. 725843
**Gibson Consumer Law Group, LLC**
4729 Roswell Road, Suite 208-108
Atlanta, GA 30342
Telephone: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

*Attorneys for Plaintiffs and  Proposed Class*

*\*Pro Hac Vice*